Paul D. **ABBOTT**, Plaintiff,

v.

**BARRENTINE MANUFACTURING COMPANY, Inc. and Tom A. Barrentine, Defendants.**

No. GC6320.

United States District Court
N. D. Mississippi,
Greenville Division.

Sept. 30, 1965.

On Motion to Amend March 31, 1966.

A. Yates Dowell and A. Yates Dowell, Jr., Washington, D. C., Freeland & Gafford, Oxford, Miss., for plaintiff.

H. Talbot Odom, Odom, Odom & Pittman, Greenwood, Miss., Jennings, Carter & Thompson, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

CLAYTON, Chief Judge.

Plaintiff, Paul D. Abbott, brought this suit against defendants, Barrentine Manufacturing Company, Incorporated, and Tom A. Barrentine, for infringement of plaintiff's United States Patent No. 3,031,208 and for defendants' unfair competition with plaintiff. Defendants answered, denying validity of the patent, denying infringement and denying unfair competition. Trial was to the court and the case has been submitted on briefs of the parties.

1) Plaintiff is a resident of Blytheville, Arkansas, and is the owner of the patent in suit which was issued to him on April 24, 1962, upon an application filed October 25, 1960. Defendant, Barrentine Manufacturing Company, Incorporated, is a Mississippi corporation located in Greenwood, Mississippi, and defendant, Tom A. Barrentine, is the principal stockholder, president and dominant individual of this corporation.

2) In the prosecution of the application for this patent before the United States Patent Office, the petition was originally assigned to Examiner L. J. Blackmar in Division One. There were five claims in the application, and on the first action the examiner allowed Claim 1 and rejected Claims 2 through 5. In plaintiff's response of October 24, 1961, the specification was amended to correct informalities, Claims 2, 3, and 4 were amended and a new Claim 6 was added. The new Claim 6 was similar in scope to Claim 1, but somewhat broader. The rejections of Claims 2, 3, 4 and 5 were argued on the basis that there was no suggestion anywhere in the prior art of combining the references in a manner suggested by the examiner and that even if such a combination were made, the resulting structure did not perform the same function as plaintiff's device.

3) On the next action, the application had been transferred to Division 47 and assigned to Examiner R. C. Podwil who apparently found no other pertinent references, and Claims 1, 2, and 6 were allowed, but Claims 3, 4, and 5 were again rejected on February 28, 1962. After an interview with both examiners, Claims 3 to 5 inclusive were rewritten as Claims 7 and 8. Claims 3 through 5 had been rejected as unpatentable over the British patent to Wolseley 647,622 and the British patent to Bruce 780,670. In plain-

tiff's arguments against both the Wolseley and Bruce patents, no mention was made of plaintiff's lift unit as being an important element necessary to the operation of the device which neither of the British references disclosed. As a result of the interview, plaintiff's amendments, Claims 7 and 8, were allowed and the application subsequently issued as the patent now in suit. The application was examined by three different examiners in two different divisions of the United States Patent Office, and it must be assumed that they examined the most pertinent prior art. In addition to the mentioned British patents, three United States patents were relied upon. They are:

| Toland | 2,611,304 |
| Simpson | 2,693,965 |
| Orelind | 2,779,260 |

4) At the time of plaintiff's invention, there were various makes, models and sizes of agricultural implements and of tractors or propelling vehicles. The manner of connecting an agricultural implement to a propelling vehicle had reached a degree of development well known to those working in that field, but no device had been provided with which agricultural implements having different attaching means could be connected to tractors. Hitch devices then in use were known as one-point hitch, two-point hitch or three-point hitch. These three types of hitches may be described as follows:

a) A one-point hitch has a single connection and normally is used by a propelling vehicle to pull or tow a non-propelling or following vehicle which usually has ground-engaging wheels and normally is not raised free or out of engagement with the earth.

b) A two-point hitch or fast hitch is a type of connection which was first introduced by International Harvester Company and normally includes a pair of tubes or sleeves carried by the propelling vehicle and adapted to removably receive a pair of co-operating prongs rigidly fixed to an implement so that up-and-down movement of the tubes will raise or lower the implement out of contact with the earth.

c) A three-point hitch is a type of hitch invented by Harry Ferguson and first produced by the Tractor Division of the Ford Motor Company. It includes a pair of spaced generally parallel draft arms pivotally connected to an implement and a third arm which normally is adjustable, located at a higher elevation than the first two arms and connected to an A-frame on the implement. With this type of hitch when the lift arms are raised by the tractor mechanism, the implement will be raised free from engagement with the earth and will remain generally parallel thereto, due to the parallelogram action of the three points of connection.

Obviously, a two-point hitch has one or more points of connection, and a three-point hitch has one or more points of connection or two or more points of connection. However, a three-point hitch of the type disclosed by the prior art could not accommodate what is known to the trade as a two-point hitch nor could it normally accommodate a one-point hitch. Each type of hitch has its own particular type of connection, and before plaintiff's invention, the different types were not compatible with each other. Thus, a tractor with a two-point hitch could accommodate implements having two-point connections only and was useless for attaching and propelling implements having a one-point connection or a three-point connection. The same is true of tractors having a three-point connection which could accommodate implements having a three-point connection only.

5) The prior art is replete with modifications and improvements of each of these basic hitches. However, the prior art did not include an apparatus by which any implement, regardless of whether it is equipped with a one, two, or three-point hitch could be connected to a single propelling vehicle. It was such a combination of elements, constituting a universal

hitch, that plaintiff invented and as a result applied for and was granted the patent in suit.

6) Said patent which was granted for plaintiff's "universal tractor hitch", in addition to the specific imbodiment of his invention which was disclosed therein, contained five claims numbered 1 through 5 inclusive. During the course of the trial, any reliance on Claim 1 was eliminated by stipulation. Thus, this court must look to the language of Claims 2, 3, 4, and 5 to determine whether defendants have infringed this patent, if it is found to be valid.

7) In addition to the patents cited by the Patent Office, defendants rely upon several other prior art patents as anticipatory of plaintiff's device. These additional references are as follows:

| | |
|---|---|
| Lindeman | 2,616,349 |
| Wetzel | 2,753,784 |
| Harris | 2,780,160 |
| Altgelt | 2,822,739 |
| Clarke | 2,865,657 |
| Tapp | 2,918,131 |
| Heberlein | 3,029,880 |
| British Patent | 820,063 |
| French Patent | 1,196,633 |

The Lindeman patent is a modified two-point hitch in which a tool bar is clamped to the draft arms of a tractor so that when the draft arms are raised, the tool bar and the implement thereon will be raised.

8) The Wetzel patent is a modified type of three-point hitch having a lift mechanism similar to plaintiff's original three-point hitch and plaintiff's original universal hitch on which he obtained a patent.

9) The patent to Harris is a three-point tool adapter for tractors which discloses a modified method and apparatus for controlling the position of the draft arms so that a three-point type of implement or tool can be attached thereto and operated therefrom.

10) The Altgelt patent is a modified type of three-point hitch which includes a drawbar disposed between the outer free ends of the draft arms and such drawbar is adapted to slideably receive a socket mounted on the implement, such socket being the full equivalent of the two lower points of a three-point hitch. The implement is provided with an upper section having a V-shaped notch to which a link corresponding to the adjustable member or turnbuckle of a three-point hitch is connected.

11) The Clarke patent is a modified three-point hitch in which the implement is pivotally connected to the outer free ends of the draft arms and an adjustable member connects the tractor with an A-frame carried on the implement.

12) The Tapp patent is a three-point hitch having draft arms at opposite sides of the tractor and an intermediate adjustable member at a high elevation connected to an A-frame on the implement.

13) The Heberlein patent is a two-point hitch adapter for a tractor lift whereby a tractor having a three-point hitch can be converted to a two-point hitch by removing the lower draft arms and substituting other draft arms to which an adjustable sleeve has been attached and which is adapted to receive the prongs of a two-point or fast hitch. After the modification or substitution has been made, the hitch is strictly a two-point hitch and cannot be used to connect an implement having three connecting points unless the hitch is converted back to a three-point hitch.

14) British Patent 820,063 is a conventional two-point or fast hitch. This patent was applied for in the name of the International Harvester Company and is similar to their two-point hitch aforementioned.

15) French Patent 1,196,633 is a three-point hitch having a modified lifting structure to make certain that the lift arms are raised equally and simultaneously.

16) The prior art as disclosed in all of the mentioned patents, taken independently or in combination, does not disclose such a universal type hitch as provided by plaintiff which will accommodate a two-point or a three-point implement. Additionally, defendants stipulated that none of the prior patents cited by them is an anticipation of the claims in suit. Thus, these claims are directed to a new structure and if plaintiff's patent is found to be valid, they should be entitled to a broad interpretation.

17) With respect to the validity of the patent, defendants contend that plaintiff sold the basic structure of his patent, with tubes thereon which would permit it to be used in more than one way, more than one year prior to the filing of his application for the patent in suit, leaving as the only new thing about the entire combination the means to adjust the ends of the tubes up and down and in and out relative to the drawbar and that this does not amount to patentable invention in view of the art. Further, they contend that the differences between the basic sttructure aforementioned and the remainder of the structure as patented in light of the prior art are obvious to a person having ordinary skill in the art and hence there is no patentable invention under 35 U.S.C. § 103. These arguments, however, overlook the aforementioned history of the prosecution of this patent application before the United States Patent Office and do not take into account the step by step experimental development of this device by plaintiff. Plaintiff set out to design a universal tractor hitch which would accommodate implements with different types of connections. His first effort resulted in a three-point hitch with a lift mechanism having a pair of fluid cylinders connectable to the hydraulic system of a tractor. This device operated satisfactorily as a three-point hitch, but was unsuitable for connection to an implement having a two-point hitch. Plaintiff attempted to modify the device by welding tubes or sleeves onto the draft arms of his three-point hitch, but this did not solve the problem.

As the result of further experimentation and development, the universal hitch was slowly evolved, utilizing the basic lift mechanism of plaintiff's original three-point hitch, but *with the completed structure having the capability of being connected, without structural change, to any implement having either a one, two, or three-point hitch.* Thus the entire record does not support a finding that there was a sale, a disclosure or a dedication to the public at any time more than twelve months before the filing date of the application which led to the granting of the patent in suit.

18) Further, in light of the prima facie presumption of validity which must attach to this patent (35 U.S.C. § 282) and the reliance which this court must place on the expert knowledge of the United States Patent Office-in this field, it must be said that the evidence in this case does not permit this court to say that the critical and different portions of this invention would have been obvious to a person having ordinary skill in the art at the time the application for this patent was filed. Lending strength to this finding is the fact that the defendants have more than ordinary skill in the art and yet they were unable to design a device which would perform as will plaintiff's invention until they studied one of plaintiff's universal hitches manufactured by him after his patent was granted. Plaintiff's said patent is valid.

19) Plaintiff's first universal hitch was designed primarily to fit an older model International Harvester type M tractor, and after plaintiff was convinced that his invention was practical and operated to his satisfaction, he then applied for a patent. This hitch was readily adaptable to accommodate various makes, models and sizes of agricultural implements and permitted a farmer to purchase an implement for its practical use regardless of the type of hitch with which his tractor was equipped. Subsequently, plaintiff modified his basic design slightly to accommodate later model tractors. However, the design remained within the spirit and

scope of his original invented concept as set forth in the claims and disclosures of his patent. Plaintiff's objective was to provide a universal hitch by means of which an implement could be connected to and mounted upon a tractor and with such hitch affording full use of the implement regardless of the make of the tractor or the make of the implement or the number of connections between the two. His structure included a pair of spaced mounting brackets carried by the rear axle housing, with one of such brackets located at each side of the tractor. It included also a generally U-shaped drawbar mounted substantially horizontally and with such drawbar interconnecting and pivotally connected to the mounting brackets with the connecting portion of the drawbar extending rearwardly or away from the tractor. Lift mechanism was provided in order to raise and lower the rear portion of the U-shaped drawbar and such lift mechanism connected to the hydraulic system of the tractor for operation thereby. The lift mechanism is pivotally connected to the mounting brackets and has portions connected to the U-shaped drawbar. A pair of sleeves, or tubes, are mounted on the U-shaped drawbar, one at each side, by means of a universal connection at one end which will permit both vertical and lateral motion of the opposite end of each tube. A tongue is removably received within each of the sleeves, or tubes, and each tongue is provided with a pair of ball and socket type bearings. One of the bearings of each tongue has an opening of a size to accommodate the connecting pin of a Category I implement (a lighter type) and the other bearing of each tongue has an opening of a size to accommodate the connecting pin of a Category II implement (a heavier type). The tongue of each tube is reversable so that either bearing may be disposed uppermost to obtain the maximum movement of the implement when in use. Since the connecting pins of the Category II implements are spaced apart, a greater distance than the connecting pins of the Category I im-

plements, it was necessary that the free ends of the tubes be adjustable in accordance with the spacing of the connecting pins and, therefore, structure is also provided for adjusting the free end of each tube and for securing such tube in its adjusted position. When a two-point hitch is to be connected to the tractor, the tongues are removed from each of the sleeves, after which the sleeves will accommodate the prongs of the two-point implement and be connected thereto.

20) Since the patented structure was designed to be received by an older type tractor, when it was desired to apply the hitch to a newer type tractor it became necessary to modify the structure of the hitch slightly in order to adapt it to the structure of the new type tractor. This was accomplished by altering the lift mechanism by providing a yoke interconnecting the mounting brackets and moving the yoke by means of a single double-acting fluid cylinder by merely reversing some of the parts of the lift mechanism. This alteration is the full mechanical equivalent of the lift mechanism disclosed by the patent.

21) The record shows that Barrentine Manufacturing Company, Incorporated designed and developed a new universal type hitch in April 1963. This hitch was designed in the engineering department of this corporation by various Barrentines and others including the defendant Tom A. Barrentine and was accomplished after a hitch manufactured under plaintiff's patent was brought into the shop and examined. They did get ideas from the Abbott hitch and defendants began that month to build and market their hitch without consulting a patent attorney. Plaintiff warned defendants in April 1963, at which time the defendants requested a license, until such time as they could be advised by their attorney. Following this confrontation, defendants stopped manufacturing their hitch until later they were advised by their attorney that it did not infringe. They then resumed manufacture of such hitch. A hitch they attempted to manufacture in the

interim did not become perfected and was abandoned. As a witness, Tom A. Barrentine compared defendants' hitch to plaintiff's and conceded a number of essential points of similarity and admitted getting certain ideas from the plaintiff's hitch.

22) Claim 5 of the patent in suit is directed to a universal tractor hitch having six elements, all of which are contained in plaintiff's device as it was and is being manufactured. These elements are:

a) A pair of mounting brackets attached one to each side of the tractor.

b) A drawbar connects and is pivoted to said mounting brackets. This drawbar is located at the lower portion of the mounting brackets and extends horizontally and substantially parallel to the ground or other supporting surface.

c) A toggle lift bar is attached to the drawbar and is pivotally mounted by having its end portions connected to each of the mounting brackets. The claim does not require two toggle lift bars, but one toggle lift bar with two portions pivotally mounted one on each end of the mounting brackets falls within the language of this claim.

d) Fluid actuating means for operating lift bars refers to the double-acting fluid cylinder which is disposed at an angle of substantially 45 degrees in plaintiff's modified structure.

e) An elongated implement attaching member is pivotally attached at one end to the drawbar. This implement attaching member refers to the tubes, or sleeves, mounted one at each side of the drawbar.

f) An adjusting member is connected to the free end of the elongated member for securing said members in vertically or horizontally adjusted position. This is connected either directly or indirectly to the free ends of each of the sleeves.

23) Defendants' first model of a universal or all purpose hitch (Plaintiff's Exhibit 5) corresponds element by element to the structure of plaintiff's device. This first model is the only such device which was being manufactured by defendants at the time when this suit was brought. It is substantially identical with plaintiff's said structure and infringes Claim 5 of the patent.

24) Claim 4 of the patent in suit is substantially identical to Claim 5 with the exception that "a mounting plate located centrally of said drawbar and providing an attachment for an implement having a single hitch" is also recited. Such a mounting plate is also included in defendants' first model and thus, to that extent, this structure infringes Claim 4.

25) Claim 3 is similar to Claims 4 and 5 with the exception that the drawbar has been defined as U-shaped, and "a tongue movably mounted with regard to said elongated structure" is also included. Defendants' first model hitch has a U-shaped drawbar and a tongue movably mounted with regard to said elongated structure. Hence, this model, to that extent, infringes Claim 3.

26) Claim 2 defines plaintiff's structure as including a bracket for attachment to the rear axle of the tractor, a pair of spaced mounting brackets, a drawbar, a mounting member located centrally of the drawbar, a pair of toggle lift bars connected to the drawbar, said drawbar being carried by said spaced mounting brackets, fluid means for operating said lift bars, a co-operating implement mounting members, structure for adjusting the horizontal and vertical positions of said co-operating members, with said co-operating members having at least one universal joint for attachment to an implement. Defendants combined the bracket attachment for the rear axle of a tractor and the pair of spaced mounting brackets, but otherwise, every element of this claim is found in defendants' first model against which this suit was brought.

27) After this suit was brought, defendants modified their structure in what apparently was an obvious attempt to avoid the claims of plaintiff's patent. The structure thus modified and as pro-

duced and sold by defendants falls within the language of Claim 5 of plaintiff's patent and this claim reads directly upon this modified form of defendant's hitch. With respect to this structure, defendants contend that the implement attaching members at the sides of the drawbar, although concededly mounted for horizontal adjustment, are not mounted for vertical adjustment. In the patent the series of holes, 69 in the member 66 (Fig. 1) permit vertical adjustment within a range of about three inches. In defendants' structure, the member by which the implement attaching member is adjusted may be mounted between the upper and lower sides of a fixed member or on the top or bottom thereof, such mounting being permitted by the nut and bolt which may be removed to permit different arrangements of the parts. With these different adjustments, a range in height of at least one inch is obtained. Such an adjustment permits the raising or lowering of one side of the drawbar. Clearly these members may be adjusted vertically to this limited extent.

28) It was stipulated that another hitch of defendants, typified by Defendants' Exhibit 3, does not infringe any of the claims of plaintiff's patent and the court now so finds.

■ 29) In addition to the claims of infringement asserted by plaintiff which have thus far been dealt with, the court now finds as a fact that plaintiff's claims of unfair competition, as such, separate and apart from the claims of patent infringement, are not supported by the evidence with respect to the sale of the accused hitches in competition with plaintiff. Moreover, the evidence fails to convince the court that the defendants' accused hitches are of any less quality than those of the plaintiff. In fact, it appears from the evidence that these accused hitches are just as good, material-wise and workmanship-wise as are the devices manufactured by plaintiff.

■ 30) The evidence does show that the dollar volume of plaintiff's business was lowered substantially after defendants began to manufacture and sell these accused devices. However, the record does not justify a finding that all of this loss of business can properly be attributed to defendants' activities. As the court judicially knows, constant changes occur in the farm tractor and farm implement industry and the effect of such changes during the period with which we are concerned here, if any, is not shown by the evidence now before the court.

31) Plaintiff admitted and the court so finds, that plaintiff has granted to Paul Abbott Company, Incorporated, an exclusive license under the patent here in suit under the terms and conditions of which plaintiff receives no royalty for the manufacture and sale of his hitch under said license.

■■ 32) The claims of a patent are entitled to a reasonable interpretation in the light of the patent disclosure and of the prosecution before the United States Patent Office, and in view of the prior art both in the patent office and in the particular field. The law requires, as was done here, that at least one example or embodiment of an invention be disclosed in the drawings and specification of a patent with sufficient clarity so that a person skilled in the art can practice the invention. The claims of a patent must particularly point out the subject matter which the applicant regards as his invention or discovery, but a plurality of claims of varying scope may be allowed. Such claims are limited only by the terminology and scope of the wording thereof, in view of the prior art. Such claims are not limited to the exact structure disclosed in the specification.

■ 33) Claims numbered 2 through 5 inclusive of this patent in suit here when given their natural interpretation read upon either the separate arm or the connected arm structure and are infringed by the accused devices as aforementioned. To reach this conclusion it is not necessary to in any way broaden the language of these claims.

34) In Southern Saw Service v. Pittsburgh Erie Saw Corporation, 239 F.2d 339, (5th Cir. 1956), the court noted that

the claim involved read in express terms upon the accused device. There the court held that a "pioneer" invention was not involved, but that the invention marked a distinct step in the progress of the art. It was also pointed out that merely because a preferred embodiment of the invention was accomplished in one manner, this did not limit the invention to the precise preferred structure, and that merely changing the form of certain elements whose specific form is not a limitation of the invention does not avoid infringement. All of these seem applicable to the case here, especially in light of the aforementioned history of the prosecution of this application with the Patent Office and defendants' contention of public dedication.

35) Moreover, the law seems well settled that infringement cannot be avoided by using a one-piece structure rather than a two-piece structure. Industrial Instrument Corporation v. Foxboro Company, 307 F.2d 783, (5th Cir. 1962) and the authority therein cited. See also Lilliston Implement Company v. E. L. Caldwell & Sons, Inc., 212 F.Supp. 413, (S.D.Tex.1963). It has also been held that infringement is not avoided by making one implement into a plurality of parts. Duo Flex Corporation v. Builders Service Company, 322 F.2d 94 (5th Cir. 1963); Jeoffrey Manufacturing, Inc. v. Graham, 206 F.2d 772 (5th Cir. 1953) and Bryan v. Garrett Oil Tools, Inc., 245 F.2d 365 (5th Cir. 1957).

36) As has been heretofore stated, the record strongly indicates that the defendants obtained and used plaintiff's hitch from which they admittedly received ideas after an unsuccessful attempt to design a hitch of the type under consideration. Although questions of infringement and validity can be determined without regard to defendants' intention, nevertheless the courts may take such intention into consideration and this court has done so here. Thurber Corporation v. Fairchild Motor Corporation, 269 F.2d 841 (5th Cir. 1959) and authorities there cited, including Bryan v. Sid W. Richardson, Inc., 254 F.2d 191 (5th Cir. 1958).

37) Further, defendants to avoid the calls of the claims of plaintiff's patent may have followed its teachings imperfectly or not exactly. Or they may have built a device that does not function in exactly the same way or as well as the patented structure. But it is a well established rule that this will not suffice so long as the substance of the invention is appropriated by the accused device. Matthews v. Allen, 182 F.2d 824 (4th Cir. 1950); Clarage Fan Company v. B. F. Sturtevant Co., 148 F.2d 786, (6th Cir. 1945), cert. den. 326 U.S. 727, 66 S.Ct. 32, 90 L.Ed. 431; Stearns v. Tinker & Raser, 252 F.2d 589, (9th Cir. 1957); Admiral Corporation v. Zenith Radio Corporation, 296 F.2d 708, (10th Cir. 1961); Ekco Products Company, Inc. v. Chicago Metallic Manufacturing Co., 321 F.2d 550, (7th Cir. 1963). And whether defendants had any intention to infringe plaintiff's patent is immaterial. Condenser Corporation of America v. Micamold Radio Corporation, 145 F.2d 878, (2d Cir. 1944).

38) Again, and at the risk of being repetitious, even though some of the elements of plaintiff's patent were present in the prior art, such prior art does not "reveal either singly or in the aggregate, substantially the same combination, structure and mode of operation" disclosed in the patent in suit in such manner as to constitute anticipation, but, plaintiff's "combination produces a new and useful result in a substantially different way" and hence meets the standards of patentability as was determined by the Patent Office. Jeoffrey Manufacturing, Inc. v. Graham, supra. And, as has been said, this patent is presumed to be valid. The statute (35 U.S.C. § 282) and the cases so state. Bryan v. Garrett Tools, Inc., supra; Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17, (5th Cir. 1957), and Graham v. Jeoffrey Manufacturing, Inc., 206 F.2d 769, (5th Cir. 1953).

39) Finally, all of the cases cited by defendants have been considered. All of

them are distinguishable on their facts from the facts as found from the record here and none of them are closely enough related to this case factually to require discussion. Most, if not all, of them announce good law, but that law is not persuasive or controlling here.

Plaintiff is entitled to relief at this time to the extent indicated and to a judgment declaring his said patent valid and infringed and granting the injunction sought to prevent further infringement of this patent. Such a judgment will be entered.

### On Motion to Amend Findings.

On September 30, 1965, this court released its Memorandum Opinion, and on the same day entered a judgment finding plaintiff's patent in suit (No. 3,031,208, issued April 24, 1962) and certain claims thereof valid and infringed by defendants. The judgment enjoined defendants from further infringement, and by paragraph 4) thereof, ordered as follows:

That all questions of damages of every sort and attorneys fees abide an accounting, for all of which purposes the court now specifically reserves jurisdiction.

No appeal by defendants was prosecuted within the time allowed from the aforementioned actions, and on December 6, 1965, counsel for plaintiff requested by letter that the court indicate how the matter of the accounting was to be handled. This letter also raised the question of an allowance of attorneys fees. Upon receipt of a copy of said letter, counsel for defendants wrote the court on December 7, 1965, contending that plaintiff was entitled to no accounting since the court had found plaintiff had granted an exclusive license to a corporation, for which he receives nothing. This letter also requested an opportunity to file a memorandum in opposition to an accounting and the allowance of attorneys fees. Plaintiff's counsel again wrote the court on December 9, contending that the view of counsel for defendants was wrong and that an accounting should be had and attorneys fees awarded.

The court, on December 14, 1965, directed the parties to furnish simultaneous briefs within twenty days on the questions of whether plaintiff is entitled to an accounting, and the propriety of an award of attorneys fees.

On January 5, 1966, plaintiff filed a motion to amend a paragraph of the court's said memorandum opinion, and as a part of the motion, included what amounts to a brief or argument. On January 7, 1966, defendants' counsel addressed a letter to the court opposing plaintiff's said motion and responding to the argument part thereof. All of the aforesaid letters will now be filed in the jacket file.

It is on the briefs of the parties and the aforementioned materials that the matters raised thereby are now before the court for disposition.

With respect to the plaintiff's motion to amend paragraph 31) of the Memorandum Opinion of September 30, 1965, a careful rereading of all of the evidence bearing on the matters dealt with in that paragraph convinces the court that it should be modified or amended substantially as sought in plaintiff's said motion.

The paragraph presently reads as follows:

31) Plaintiff admitted and the court so finds, that plaintiff has granted to Paul Abbott Company, Incorporated, an exclusive license under the patent here in suit under the terms and conditions of which plaintiff receives no royalty for the manufacture and sale of his hitch under said license.

Said paragraph 31) is vacated and withdrawn and is now amended to read as follows:

31) Plaintiff granted to Paul Abbott Company, Incorporated, of which plaintiff owns 98% of the capital stock, an unwritten license under the patent here in suit under the terms and conditions of which plaintiff receives no royalty

for the manufacture and sale of his hitch under said license. No other license has been granted by plaintiff.

In essence, it is defendants' position that since plaintiff receives no royalty from the one license issued by him under this patent that there has been no damage done to plaintiff by defendants and that thus plaintiff is not entitled to an accounting. But this just will not do. It overlooks the fact that defendants had no license and it also overlooks entirely the clear provisions of 35 U.S.C. § 284, which reads:

> Upon finding for the claimant the court shall award claimant damages adequate to compensate for the infringement, *but in no event less than a reasonable royalty* for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. (Emphasis added.)

In Graham v. Jeoffroy Manufacturing, Inc., 253 F.2d 72 (5th Cir. 1958), the court held that the reasonable royalty provision of the statute (35 U.S.C. § 284) is only the measure of the *minimum* amount that the court is permitted to find. In Rockwood et al. v. General Fire Extinguisher Co. et al., 37 F.2d 62 (2nd Cir. 1930), where the court held that the royalty provided by a license granted by a patentee to a company in which he owned 51% of the voting stock was not determinative of a reasonable royalty, it was said, inter alia, as follows:

> In fixing the measure of damages on a royalty basis against an infringer, it should be based on a sum which is reasonable and indicates a general acquiescence on the part of the prudent purchaser to pay for the increased market value due to the improvement.

That court further said:

> An amount must be found which a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market, at a reasonable profit.

The foregoing criteria are proper to be applied with respect to the accounting from defendant to which plaintiff undoubtedly is entitled.

That accounting, however, must, on the facts in this case, be limited to damages sustained by the plaintiff patentee as an individual and may not, in any event, extend to or encompass damages which may have been sustained by the corporate sole licensee, since that licensee is not a party to this suit and the patentee may not recover such damages for his licensee.

Attorneys fees may be awarded to the prevailing party in an "exceptional case" (35 U.S.C. § 285). The determination of whether this is such a case as would justify an award of attorneys fees is a matter of the court's discretion, as all the cases say. Further, it may be that the evidence offered on the question of damages may seriously affect a resolution of this issue with respect to attorneys fees, and that thus a determination of this question would be premature at this time. As a matter of precaution, that issue will be reserved for disposition along with the question of damages.

An order will be entered in accordance with this opinion.